United States District Court
Middle District of Florida
Jacksonville Division

**ELVES TERRELLE THOMAS,**

    *Plaintiff,*

v.                                                                         **NO. 3:18-CV-679-J-34PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

---

## Report & Recommendation

This is a case under 42 U.S.C. §§ 405(g)[1] and 1383(c)(3) to review a final decision of the Commissioner of Social Security denying Elves Terrelle Thomas's claims for disability insurance benefits and supplemental security income.[2] Thomas contends the Administrative Law Judge ("ALJ") erred by improperly analyzing his mental and physical impairments.

---

[1] Unless otherwise indicated, legal citations are to the statutes and regulations in effect on October 28, 2014, when Thomas filed his claim.

[2] The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York,* 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906, 416.1400−416.1406. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918, 416.1407−416.1418. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929−404.943, 416.1429−416.1443. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982, 416.1466−416.1482. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. §§ 404.981, 416.1481.

I.      **Background**

Thomas was born in 1969. Tr. 386. He completed some school[3] and has worked as a laborer, lawn worker, and maintenance mechanic. Tr. 46, 391, 397. He last worked in August 2014. Tr. 390. He alleges he became disabled on July 1, 2014, from bad knees, breathing problems, body pain, right knee pain, breathing problems (shortness of breath), body pain, blood clots in his lungs, a rotator-cuff tear, arthritis, and a spinal tumor. Tr. 232. He proceeded through the administrative process, failing at each level. Tr. 2, 35, 190, 232. This case followed. Doc. 1.

II.     **ALJ's Decision**

The ALJ conducted a hearing on May 8, 2017. Tr. 42–60. Thomas was represented by an attorney. Tr. 42. The decision under review is the ALJ's decision dated July 5, 2017.[4] Tr. 22–41. The relevant period for disability insurance benefits is July 1, 2014 (the alleged onset date), to December 31, 2018 (the date last insured). Tr. 370, 386. The relevant period for supplemental security income is October 28, 2014 (the application date) to July 5, 2017 (the date of the ALJ's decision). Tr. 35, 196.

The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking (1) whether he is engaged in substantial gainful activity, (2) whether he has a severe impairment or combination of impairments, (3) whether the impairment or combination of impairments meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4)

---

[3]The ALJ found Thomas has at least a high school education. Tr. 34. Thomas identifies this error in his brief but does not contend it warrants remand. *See* Doc. 15 at 2.

[4]Where, as here, the Appeals Council denies review, the ALJ's decision is the final decision for federal-court review. 20 C.F.R. §§ 404.900, 404.901, 404.981, 416.1400, 416.1401, 416.1481.

whether he can perform any of his past relevant work[5] given his residual functional capacity ("RFC"), and (5) whether there are a significant number of jobs in the national economy he can perform given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

At step one, the ALJ found Thomas has not engaged in substantial gainful activity since July 1, 2014 (the alleged onset date). Tr. 28.

At step two, the ALJ found Thomas suffers from severe impairments of left-shoulder-tendon tear, right-knee osteoarthritis, history of pulmonary embolism, depression, anxiety, and asthma.[6] Tr. 28.

At step three, the ALJ found Thomas has no impairment or combination of impairments that meets or medically equals the severity of any impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listing 1.02 (major dysfunction of a joint). Tr. 29. He considered the "paragraph B"[7] criteria and found

---

[5]"Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. §§ 404.1560, 416.960.

[6]The ALJ found Thomas's insomnia, gastrointestinal esophageal reflux disease, history of anti-coagulant therapy, plantar fasciitis, foot deformity, and tarsal-tunnel syndrome non-severe. Tr. 28. At the hearing, Thomas reported having schizophrenia, but the ALJ concluded the diagnosis could not be medically determined without an objective documentation. Tr. 29. Thomas does not challenge any of these findings.

[7]The paragraph B criteria are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C) (2017). The Social Security Administration considers the claimant's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § § 404.1520, 416.920a(c)(1)–(4) (citing 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00E). To satisfy the "paragraph B" criteria, the mental impairment must result in "an 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A)(2)(b) (2017). The limitations found when assessing the "paragraph B" criteria are not an RFC assessment. SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). A mental RFC assessment "requires a more detailed assessment by itemizing various

Thomas has moderate limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing himself. Tr. 30. The ALJ also considered the "paragraph C"[8] criteria and found Thomas does not meet them. Tr. 30.

The ALJ found Thomas has the RFC to perform unskilled light work[9] with additional limitations:

> [No] complex instructions or procedures; no climbing of ropes, ladders, or scaffolds; no work at unprotected heights or with hazardous machinery; occasional stooping, crouching, crawling, or kneeling; occasional overhead reaching with non-dominate left upper extremity; lifting with left upper extremity limited to 15 pounds; no concentrated exposure to dust, fumes, or other respiratory irritants; no concentrated exposure to extreme heat or cold; frequent interaction with co-workers and supervisors; and occasional contact with the general public.

Tr. 30–31.

At step four, the ALJ found Thomas cannot perform his past relevant work. Tr. 34.

At step five, the ALJ found Thomas could perform the jobs of small products assembler, production assembler, and assembler of cutlery hardware, and those jobs exist in significant numbers in the national economy. Tr. 34. The ALJ therefore found no disability. Tr. 34–35.

---

functions." *Id.*

[8] Paragraph C lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A).

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567, 416.967(b).

4

Thomas submitted additional evidence to the Appeals Council. Tr. 2. In denying review, the Appeals Council determined some evidence was not new; some evidence showed no reasonable probability of changing the disability decision and therefore was not considered; and some evidence was outside the relevant period (after the ALJ's decision), for which Thomas would need to file a new application. Tr. 2.

### III. Standard of Review

A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "less than a preponderance"; a court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and quoted authority omitted). If substantial evidence supports an ALJ's decision, a court must affirm even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "This restrictive standard of review applies only to findings of fact," and "no similar presumption of validity attaches to the [Commissioner's] conclusions of law[.]" *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoted authority omitted).

### IV. Law & Analysis

To obtain benefits, a claimant must demonstrate he is disabled. 20 C.F.R. §§ 404.1512(a) (2014), 416.912(a) (2014). A claimant is disabled if he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ must consider all relevant record evidence. 20 C.F.R. §§ 404.1520(a)(3) (2012), 416.920(a)(3) (2012). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted).

A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The Social Security Administration uses the RFC at step four to decide if the claimant can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy she can perform. 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). The ALJ need not defer to any medical opinions concerning the RFC. *See* 20 C.F.R. §§ 404.1527(d)(3) (2012), 416.927(d)(3) (2012).

The ALJ has a duty to develop a full and fair record, regardless of whether the claimant is represented by counsel. *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981). But the claimant bears the burden of establishing disability and must produce evidence to support the claim. *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003). If the ALJ fails to fulfill his duty to fully develop the record, remand is warranted if "the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995) (quotations omitted). If a medical source "cannot or will not give [the Social Security Administration] medical evidence about [a claimant's] impairment …, [the Social Security Administration] may ask [the claimant] to have one or more physical or mental"

6

examinations at no cost to the claimant. 20 C.F.R. §§ 404.1517, 416.917. The Social Security Administration generally "will not request a consultative examination until [it] has made every reasonable effort to obtain evidence" from the claimant's medical sources. 20 C.F.R. §§ 404.1512(b)(2), 416.912(b)(2).

### A.   *Mental Impairments*

Thomas contends the ALJ's decision "improperly fails to recognize Mr. Thomas' declining mental status" after late 2015 by relying too heavily on evidence from early 2015. Doc. 15 at 14.

In considering the "paragraph B" criteria at step three, the ALJ made the following findings:

> In understanding, remembering, or applying information, the claimant has moderate limitation. According to this function report, the claimant has some limitations with remembering, understanding, and following written instructions. He reported that he requires reminders to go places and to take medications. However, he reported that he could follow spoken instructions (Exhibit 5E).
>
> In interacting with others, the claimant has moderate limitation. He reported having trouble getting along with family, friends, neighbors and others. He reported that he does not desire to be around people or in crowds due to mood swings. He reported that he does not socialize. Yet, he indicated that he could spend time with others in person and on the phone. He also reported that he does not have problems getting along with authority figures (Exhibit 5E).
>
> With regard to concentrating, persisting, or maintaining pace, the claimant has moderate limitation. In his function report, the claimant indicated that he has problems with concentrating and maintaining attention for more than five minutes. However, he reported that he could drive a car, shop in stores, and handle money. All of which require the ability to concentrat[e], persist, and maintain pace (Exhibit 5E).
>
> As for adapting or managing oneself, the claimant has mild limitation. The claimant reported difficulties with handling stress and changes in routine. He reported that his panic attacks and mental impairments interfere with his ability to obtain adequate sleep. Notably, the claimant

> reported that his limitations with conducting personal care were related to his physical impairments, not his mental impairments (Exhibit 5E).

Tr. 30.

At step four, the ALJ discussed the mental medical evidence:

> In addition to his physical impairments, the claimant has [a] history of mental health treatment for depression and anxiety throughout 2015, 2016 and 2017. According to treatment notes, the claimant reported having visual and auditory hallucinations. He also reported having trouble concentrating, nervousness, and problems with frequent worrying (Exhibits 6F, 19F, and 20F). Mental status examination findings from January 5, 2015, revealed that the claimant's psychomotor activity was normal. Although his mood was deemed appropriate, his affect was flat and dysphoric. His thought process was logical. His focus and concentration were deem[ed] adequate. Notably, the claimant was assessed with a Global Assessment of Functioning (GAF)[10] score of 51

---

[10]The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." Manual at 32−34.

The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. A GAF rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id*. A GAF rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*. A GAF rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id*.

The latest edition of the Manual abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

In July 2013, the Social Security Administration issued Administrative Message (AM)-13066, providing its adjudicators, including ALJs, with internal guidance regarding the interpretation of GAF ratings. AM-13066 acknowledged the latest edition of the Manual eliminated the use of GAF ratings but confirmed that adjudicators will continue to consider GAF ratings as opinion evidence. As with other opinion evidence, however, a GAF rating needs supporting evidence to be given much weight. According to AM-13066, "the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." The Social Security Administration cautions that a GAF rating "is

> to 60, indicative of no greater than moderate limitations in social and occupational functioning. He required only conservative treatment with psychotropic medications (Exhibit 6F). Subsequent mental health treatment notes from Total Care Clinic from 2016 and 2017 further provide that the claimant's depression continued to require only conservative treatment through psychotropic medications while his GAF score remained at 51 to 60 (Exhibits 19F and 20F).
>
> …
>
> As for the opinion evidence, great weight [is] given to the GAF scores listed throughout the medical evidence of record. His GAF scores ranging from 51 to 60 are indicative of moderate social and occupational functioning resulting from his mental impairment (Exhibits 6F, 19F and 20F). Some weight is given to the opinions of the [state agency] medical consultants. While the [ALJ] agrees with the consultants' limitations to light work, the medical evidence of record submitted at the hearing level supports additional mental limitations (Exhibits 7A, 8A, 11A, and 12A).

Tr. 33.

Thomas shows no error in the ALJ's analysis of his mental impairments. The ALJ summarized and considered the then-record evidence from the entire relevant period. *See* Tr. 30, 33. The Court may not decide facts anew, reweigh evidence, or substitute its own judgment for the Commissioner's judgment. *See Moore,* 405 F.3d at 1211. That substantial evidence supports the ALJ's findings suffices. *See id.*

Thomas contends the ALJ "heavily relied on responses to forms filled out in early 2015 … [and] the evidence closer to the date of the hearing reflects a declining mental status which is inconsistent with the ALJ's findings as far as limitations." Doc. 15 at 14. Specifically, Thomas contends the ALJ relied heavily on Exhibit 5E (Tr. 421–28), a function report completed by Thomas and his brother, Anthony Thomas, in January 2015, and focused on certain parts of the form without discussing some

---

never dispositive of impairment severity," and an ALJ should "not give controlling weight to a GAF [rating] from a treating source unless it is well[-]supported and not inconsistent with the other evidence."

9

limitations reported by Thomas. Doc. 15 at 15–16.

Thomas shows no error. The ALJ cited the January 2015 report (Exhibit 5E), but only in relation to the "paragraph B" criteria at step three to determine Thomas's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage oneself. Tr. 30. Those limitations are not an RFC assessment, *see* footnote 6, and the ALJ later summarizes the objective mental-impairment evidence.[11] *See* Tr. 33. The statements Thomas highlights to argue the ALJ did not explain why he failed to accept the entire form— that he did not socialize and had someone accompany him if he went out; could not remember what he was doing and had a short attention span; was afraid of sleeping because he felt like he was choking; and was irritable and could not sleep due to a fear of not waking up, Doc. 15 at 16—appear to be included in the ALJ's consideration at step three. *See* Tr. 30 (ALJ describing that Thomas "reported that he does not socialize"; finding a moderate limitation in remembering information and describing that "he requires reminders to go places and take medications"; finding a moderate limitation in concentrating and describing that "he has problems maintaining attention for than five minutes"; and describing that "he reported that his panic attacks and mental impairments interfere with his ability to obtain adequate sleep").

Thomas contends that, by 2017 he felt like bugs were crawling on him and he used a flashlight to search his bed for them; that the ALJ's discussion of evidence was too limited and focused on Thomas's status "prior to his decline in mid-late 2015"; and that the fact that his medications and dosages kept changing shows he was unstable. Doc. 15 at 18. Thomas contends, "Although the ALJ pointed to the Total Care progress notes, the Total Care Clinic records are computerized and the content was often internally inconsistent." Doc. 15 at 18.

---

[11]Thomas does not argue that the ALJ should have found he met the "paragraph B" criteria for disability at step 3. *See generally* Doc. 15.

Contrary to Thomas's argument, the ALJ does not limit his discussion of the medical evidence to early 2015. While the ALJ describes in detail the findings from a mental-status examination in January 2015, he cites treatment for anxiety and depression from 2015, 2016, and 2017; acknowledges Thomas reported having visual and auditory hallucinations; and states "subsequent mental health treatment notes from Total Care Clinic from 2016 and 2017 further provide that the claimant's depression continued to require only conservative treatment through psychotropic medications while his GAF score remained at 51 to 60."[12] Tr. 33.

Thomas cites no example of how the Total Care records are "computerized" and "often internally inconsistent." *See* Doc. 15 at 18. Substantial evidence supports the ALJ's statement that those records continue to show conservative treatment through psychotropic medications. *See, e.g.,* Tr. 1261–64 (November 2016 mental-status exam in which Thomas presented as calm and cooperative; he was alert and oriented to person, place, and time; he had normal psychomotor activity and regular speech; he had a normal mood; he had a congruent affect "with mood and dysphoric"; he had a

---

[12]The GAF scale ratings in the record are 51 to 60 from February 2015 to January 2016. Tr. 762, 775, 955, 989, 1002, 1024, 1030, 1179. The score from April 2016 is 41 to 50. Tr. 1179. Most later mental-health records do not appear to list GAF scale ratings.

The ALJ stated, "Subsequent mental health treatment notes from Total Care Clinic from 2016 and 2017 further provide that the claimant's depression continued to require only conservative treatment through psychotropic medications while his GAF score remained at 51 to 60," but did not address the April 2016 to rating of 41 to 50. *See* Tr. 33.

"An erroneous factual statement by an ALJ may be harmless if the ALJ applies the proper legal standard. *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983); *Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 665 (11th Cir. 2010). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). If "remand would be an idle and useless formality," a reviewing court is not required to "convert judicial review of agency action into a ping-pong game." *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).

Because one lower GAF rating does not change the other evidence showing appropriate consideration of the mental-impairment evidence, remand for any factual error here is unwarranted.

11

coherent and well-organized thought process; he had intact associations; he had an adequate fund of knowledge; he had adequate focus and concentration; he had intact immediate and recent memory; he had fair insight and judgment; the provider increased dosages of Seroquel, Cymbalta, and hydroxyzine, and the provider described his prognosis as "guarded for recovery"); Tr. 1430–33 (February 2017 mental-status exam with similar results except Thomas had a "flat affect and congruent mood," and the provider again increased the dosage of Seroquel).[13]

Thomas shows no reversible error in the ALJ's analysis of the evidence of his mental impairments.[14]

### B.   *Physical Limitations*

Thomas contends the ALJ improperly analyzed his knee condition and improperly relied on outdated medical evidence to support the RFC, making the physical limitations in the RFC unsupported by substantial evidence and not based on any medical opinion. Doc. 15 at 19, 23. Thomas points to this evidence in the record:

> Mr. Thomas had a lengthy history of knee problems since his fall in September 2014. Tr. 602-605, 680-690. He also was seen in late 2014 and reported an inability to move his left arm. Tr. 491. Examination revealed left arm weakness and pain in his shoulder when trying to move his arm. He underwent a neurology consultation on December 7,

---

[13]Thomas contends that "[b]y 2017[] he was feeling like bugs were crawling on his body at night and was using flashlights to see them." Doc. 15 at 18. Thomas first reported this in November 2015 when he went to the emergency room for "general body itching," explaining his body had started itching three months earlier when he started taking Abilify and notices it more when he lays down at night, causing him to use a flashlight to look for bugs in the bed. Tr. 1020. The provider assessed insomnia, hallucinations, and depression, and assigned a GAF scale rating of 51–60. Tr. 1024. The provider "[c]ontinued changes to Abilify," increased other medications, and described his prognosis as "fair for recovery." Tr. 1024–25.

[14]To the extent the objective medical evidence differs from Thomas's self-reported statements, the ALJ found Thomas's statements about his symptoms were inconsistent with the medical evidence, Tr. 32, and Thomas does not challenge that finding.

12

2014 for left upper extremity weakness. His examination was consistent with cervical spine stenosis with left cervical radiculopathy. On December 9, 2014, he underwent a left shoulder MRI that showed a high grade partial thickness tear distal supraspinatous tendon. On January 5, 2015, Dr. Pratt, a primary care physician, examined Mr. Thomas. Tr. 622-633. Mr. Thomas reported left shoulder pain and decreased range of motion and right knee pain with knee give way, along with other conditions. Examination revealed a decreased range of motion in all planes of the left shoulder. On January 18, 2015, Mr. Thomas was treated at Baptist Hospital emergency room. Tr. 640-651. He presented with worsening left shoulder pain and left arm numbness. His left shoulder range of motion was restricted due to pain. Mr. Thomas was diagnosed with shoulder pain and rotator cuff syndrome. *Id*.

Dr. Brunelli, an orthopedist, examined Mr. Thomas on February 10, 2015. Tr. 1050-1053, 1092. Examination revealed decreased muscle strength and point tenderness of the left shoulder with positive impingement and Hawkins sign. At that time, he did not think the MRI showed a tear. Mr. Thomas underwent a steroid injection into the left shoulder and was diagnosed with adhesive capsulitis of shoulder and left shoulder pain. He was referred to physical therapy. *Id*. On March 6, 2015, Mr. Thomas was treated at Shands Pain Management for right knee and left shoulder pain. Tr. 789-791. On April 21, 2015, Dr. Jocelyn treated Mr. Thomas for continued shoulder and knee pain, in addition to other conditions. Tr. 957-963. He was prescribed a walking cane. *Id*. Progress notes dated May 19, 2015 revealed increased right hip pain. Tr. 964-971. His right knee recently had given out and he had low back pain. Examination revealed an antalgic gait and a semi firm mass of the right upper hip. On June 8, 2015, Dr. Brunelli again examined Mr. Thomas Tr. 1058-1062. He has finished physical therapy and had more range of motion but still had continued pain. He was referred for surgery due to MRI results of the left shoulder that showed an undersurface rotator cuff tear. *Id*. [He] had to await surgery pending completion of anticoagulation therapy. Tr. 1193-1196. He had chronic left shoulder and right knee pain. *Id*.

In September 2015, Mr. Thomas was treated by Shands pain management on September 29, 2015 for left shoulder and right knee pain. Tr. 1196-1198. He was still awaiting shoulder surgery. His pain was poorly controlled. He also was having right knee pain with instability as well. Tr. 990-998. Mr. Thomas was diagnosed with chronic right knee pain, right hip pain, thoracic back pain, soft tissue mass, prediabetes, nocturia, benign prostatic hypertrophy. An x- ray of the right knee and thoracic spine showed osteoarthritis. *Id*. On October 19,

13

> 2015, Mr. Thomas underwent shoulder surgery. Tr. 1076-1092. Dr. Brunelli performed a subacromial decompression, biceps tenotomy, extensive glenohumeral debridement, undersurface rotator cuff debridement and distal clavicle excision. His post-operative diagnosis was undersurface partial thickness rotator cuff tear, biceps tenosynovitis, enthesophyte, and acromioclavicular joint arthrosis. *Id.*
>
> During the early months of 2016, Mr. Thomas was treated at Shands pain management for chronic pain. Tr. 1199-1202. He had continued left shoulder, right knee and back pain. Mr. Thomas was also seen on January 28, 2016 at Baptist Hospital. Tr. 1095-1101. He was diagnosed with right hip and chronic shoulder pain. *Id.* On February 8, 2016, Mr. Thomas returned to the Baptist Hospital emergency room. Tr. 1046-1048. He presented with three year history of pain in his left shoulder, mid back, right hip and right knee that was chronic in nature. Examination revealed decreased range of motion of his left shoulder and right hip tenderness to movement. He was diagnosed with cervical stenosis of spine and lipoma of the hip. *Id.* On May 11, 2016, Mr. Thomas was treated at Shands pain management clinic for chronic pain. Tr. 1207-1210. Mr. Thomas was again seen on September 8, 2016 at Orange Park emergency room due to worsening back pain. Tr. 1552-1561. He also reported right hip and knee pain which was ongoing for the past two years but had worsened. Examination revealed swelling and tenderness of the right thigh and an antalgic gait. On March 31, 2017, Dr. Jocelyn examined Mr. Thomas. Tr. 1624-1632. He presented with numbness and tingling of the left hand with difficulties opening jars. He also reported his knee buckled on him the prior week and he fell. Examination revealed an antalgic gait and station and paraspinal lumbar tender points. Mr. Thomas was diagnosed with fibromyalgia, chronic right hip pain, right knee, and low back pain with bilateral sciatica.

Doc. 15 at 20–23.

On Thomas's physical limitations, the ALJ stated:

> The medical evidence of record offers little support to substantiate disabling limitations. Concerning history of pulmonary embolism, the medical evidence of record [shows] the claimant was admitted to Baptist Medical Center on December 7, 2014, for complaints of left shoulder pain, weakness, and numbness. Diagnostic imaging revealed a tiny right upper lope subsegmental pulmonary embolism, which was treated with Coumadin. As provided in hospital records, the claimant's pulmonary embolism required outpatient follow-up for management. Notably, the

14

> claimant was discharged on December 9, 2014, in stable condition (Exhibit 1F). Outpatient treatment notes from Brentwood Primary Care from December 19, 2014, and December 24, 2014, provide that the claimant had normal prothrombin time results measuring 2.0 and 2.2, respectively (Exhibit 4F). With the claimant's continued anti-coagulation therapy, the pulmonary embolism resolved and did not require any further treatment for the impairment after June 2015 (Exhibits 17F and 19F). The undersigned notes that the claimant experiences period of shortness of breath (Exhibit 17F, p. 9). Yet, the medical evidence provides that the claimant's respiratory symptoms may have been exacerbated by his asthma. Even still, he required only conservative treatment with Albuterol to manage his asthma and consistently had normal respiratory findings during his course of treatment from the Total Care Clinic from 2015 through 2017 (Exhibits 19F and 21F).
>
> In terms of the claimant's left shoulder impairment, magnetic resonance imaging (MRI) of the left shoulder performed on January 26, 2015, revealed a left partial thickness supraspinatus tear. According to treatment notes, the claimant reported experiencing decreased range of motion and pain exacerbated by no movement (Exhibit 6F). Initially, the claimant's pain was treated conservatively with prescribed pain medications, anti-inflammatories, and injections. However, the claimant underwent a left shoulder arthroscopy with glenohumeral debridement on October 15, 2015. Post-operative examination notes from October 23, 2015, indicate that the claimant was doing well, with no instability episodes, or controlled pain levels (Exhibit 13F). Concerning his osteoarthritis, x-rays of the claimant's right knee performed on October 12, 2014, revealed only mild osteoarthritis with no acute fracture or dislocation (Exhibit 4F). With both his left shoulder impairment and osteoarthritis, subsequent examinations from the Total Care Clinic in 2016 and 2017 show that the claimant had no musculoskeletal abnormalities. His extremities were without cyanosis or edema. Notably, the claimant's knee pain was considered resolved (Exhibits 19F and 20F).

Tr. 32.

The ALJ also stated he "agrees with the [state agency] consultants' limitations to light work." Tr. 33.

Substantial evidence supports the RFC, and the Court may not reweigh that evidence, *see Moore,* 405 F.3d at 1211. Some evidence shows more severe symptoms,

15

as Thomas states in his brief and repeated above. Other evidence shows normal or less severe symptoms, with discussion of other pain but almost no discussion of shoulder pain in later reports. *See, e.g.*, Tr. 957, 960, 963 (April 2015: instructing that Thomas should use a cane when walking to prevent falls after he reported increased falling because of his knee; normal gait and station in a musculoskeletal exam); Tr. 1132 (November 2015: normal range of motion, no edema or tenderness); Tr. 1098 (January 2016: positive for back pain, arthralgias and pain with ambulation but negative for myalgias, joint swelling, stiffness, and peripheral edema); Tr. 1155–58 (March 2016: referencing that a hip x-ray showed only mild degenerative changes, a cervical x-ray showed only mild degenerative changes, and Thomas reported neck and right hip pain but had a normal gait and station); Tr. 1521 (April 2016: full range of motion in his back); Tr. 149 (August 2016: on a back exam, he had nontender, normal range of motion, a normal alignment, and no vertebral point tenderness; on a musculoskeletal exam, he had a normal range of motion in the bilateral hips, knees, and ankles, 5/5 strength in the lower extremities, and a normal gait); Tr. 1553, 1558 (September 2016: reported to emergency room for back, right hip, and right knee pain; had a negative straight-leg test, lumbar tenderness, minimal swelling, an antalgic gait, and was ambulatory; after resting and reevaluation was neurologically intact, ambulatory, and required no further testing); Tr. 1563, 1567 (September 2016: one week after the previous emergency visit, he returned for back pain requesting Lortab; the provider declined and offered anti-inflammatories and muscle relaxers; Thomas declined and said he would go elsewhere to get Lortab); Tr. 134 (December 2016: normal range of motion and exhibits no edema in a physical exam); Tr. 1388, 1393–94 (January 2017: restricted range of motion in the lumbar spine, right knee and lumbar tenderness, "ambulated from the waiting [room] in no distress," refilled medication and told to return in 3 months if symptoms do not improve); Tr. 64 (April 2017: normal gait and ambulated without assistance); Tr. 82–84, 89 (June 2017: presenting for low back, right-hip, and bilateral knee pain; reporting he no longer takes opiates for pain; reporting no recent falls and no fear of falling; and prescribing

16

diclofenac for pain).[15]

Thomas contends that, "towards the end of the relevant period," he was diagnosed with fibromyalgia and the ALJ "failed to meaningfully analyze the diagnosis."[16] Doc. 15 at 19. But the existence of an impairment, alone, does not reveal its effect on a claimant's ability to work or undermine RFC findings, *Moore*, 405 F.3d at 1213 n.6. Thomas has not shown how any failure to consider the diagnosis affects the RFC. The ALJ clearly considered his medical condition as a whole, Thomas did not list fibromyalgia as an impairment on his application, and neither he nor his attorney addressed fibromyalgia at the administrative hearing, *see* Tr. 42–60. *See Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010) (finding ALJ had no duty to consider a particular diagnosis because the claimant had been represented by counsel at the hearing before the ALJ but never alleged disability due to the diagnosis).

Thomas contends that the ALJ's opinion is not based on any medical opinion and observes that a similar opinion in the record, from state agency physician Irene Lipinski, M.D., was based only on evidence through May 2015.[17] Doc. 15 at 23.

---

[15] The ALJ stated, "With both his left shoulder impairment and osteoarthritis, subsequent examinations from the Total Care Clinic in 2016 and 2017 show that the claimant had no musculoskeletal abnormalities." To the extent the ALJ meant "osteoarthritis" to include any knee pain, the statement is factually inaccurate because some reports from that time, documented above, include Thomas's report of knee pain. Thomas does not specifically challenge this. As the ALJ notes, Tr. 32, under a list of medications and problems, the reports state "RESOLVED: Right knee pain" since September 30, 2015. *See, e.g.*, Tr. 851.

[16] Thomas does not contend the ALJ should have included fibromyalgia as a severe impairment at step two. *See generally* Doc. 15.

[17] The ALJ does not reference, and Thomas does not identify, any medical opinions in the record other than from the state-agency physicians. Dr. Lipinski completed an RFC assessment at the reconsideration level in May 2015. Tr. 257–60. She opined Thomas could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk with normal breaks for 6 hours in an 8-hour workday; sit with normal breaks for 6 hours in an 8-hour workday; and push or pull the same amounts he could lift or carry. Tr. 257–58. To support her conclusions, she wrote, "RFC is reduced secondary to [left]

17

Thomas contends his "condition was not static" and "subsequent evidence refutes her assumptions" regarding conservative treatment for his shoulder considering that he later required surgery. Doc. 15 at 23. He contends the ALJ should have ordered a consultative exam or the opinion of a medical expert. Doc. 15 at 23.

Thomas's argument fails. The ALJ did not have to defer to any medical opinions concerning the RFC, *see* 20 C.F.R. §§ 404.1527(d)(3) (2012), 416.927(d)(3) (2012), substantial evidence supports the RFC, and there were no evidentiary gaps in the record. Accordingly, the ALJ did not have to order a consultative exam or other medical opinion. *See Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016) (finding no error in ALJ's failure to order consultative exam where record showed no gaps resulting in unfairness or clear prejudice). The ALJ did not rely solely on Dr. Lipinski's opinion; the ALJ considered evidence post-dating her opinion to find that Thomas could perform light work with several mental and physical limitations. Thomas shows no reversible error in the ALJ's analysis of the evidence of his physical impairments.

---

shoulder with partial tear and painful, decreased [range of motion], elevated BMI, [right] knee pain, and h/o asthma/PE." Tr. 258. She opined Thomas could frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; balance with no limitation, frequently stoop, kneel, and crawl; and occasionally crouch. Tr. 258. She explained the limitation on climbing ladders was "secondary to reported falls and [complaints of] lightheadedness." Tr. 258. She opined he was limited in reaching overhead and was unlimited in handling, fingering, and feeling. Tr. 258–59. To support that conclusion, she noted the left-shoulder issues and stated he had been "[t]reated conservatively." Tr. 259. She opined he should avoid concentrated exposure to hazards and fumes because of asthma and reported falls but had no limitations on exposure to extreme cold or heat, wetness, humidity, noise, and vibration. Tr. 259.

## V.  Recommendation

I recommend:

**(1)** affirming the Commissioner's decision under sentence four of 42 U.S.C. § 405(g);

**(2)** directing the Clerk of Court to enter judgment under sentence four of 42 U.S.C. § 405(g) in favor of the Commissioner and against Elves Terrelle Thomas; and

**(3)** directing the Clerk of Court to close the file.[18]

**Entered** in Jacksonville, Florida, on August 5, 2019.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   The Honorable Marcia Morales Howard
     Counsel of Record

---

[18]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.